# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| REID BRAZELL SAGEHORN, | Civil No.  14-1930 (JRT/BRT) |
| Plaintiff, | |
| v. | |
| INDEPENDENT SCHOOL DISTRICT NO. 728; ROMAN PIERSKALLA, *in his individual capacity as Principal of Rogers High School*; MARK BEZEK, *in his individual capacity as Superintendent of Independent School District No. 728*; JANA HENNEN-BURR, *in her individual capacity as Assistant Superintendent of Independent School District No. 728*; JEFFREY BEAHEN, *in his individual capacity as Police Chief for Rogers Police Department*; and STEPHEN SARAZIN, *in his individual capacity as a police officer for Rogers Police Department*, | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

Robert Bennett and Paul C. Dworak, **GASKINS, BENNETT, BIRRELL, SCHUPP, LLP**, 333 South Seventh Street, Suite 3000, Minneapolis, MN 55402, for plaintiff.

Amy E. Mace, **RATWIK ROSZAK & MALONEY**, 730 Second Avenue South, Suite 300, Minneapolis, MN  55402; and Trevor S. Helmers and Elizabeth J. Vieira, **RUPP, ANDERSON, SQUIRES & WALDSPURGER**, 527 Marquette Avenue South, Suite 1200, Minneapolis, MN  55402, for defendants Independent School District No. 728, Roman Pierskalla, Mark Bezek, and Jana Hennen-Burr.

Jessica E. Schwie **JARDINE LOGAN & O'BRIEN, PLLP**, 8519 Eagle Point Boulevard, Suite 100, Lake Elmo, MN  55042, for defendants Jeffrey Beahen and Stephen Sarazin.

This is an action brought by plaintiff Reid Sagehorn against Independent School District Number 728 ("ISD No. 728"); Roman Pierskalla, the Principal of Rogers High School; Mark Bezek, the Superintendent of ISD No. 728; and Jana Hennen-Burr, the Assistant Superintendent of ISD No. 728 (collectively, "the School Defendants"). Sagehorn has also named as a defendant Jeffrey Beahen, the Police Chief of the Rogers Police Department, and Stephen Sarazin, an individual officer at the Rogers Police Department (collectively, "the Police Defendants"). Sagehorn was a senior at Rogers High School in 2014, when he was suspended after he responded "actually yes" to an anonymous internet post asking "did @R_Sagehorn3 actually make out with [name of female teacher at Rogers High School]." The school district subsequently informed Sagehorn that he would be expelled if he did not withdraw from the district, and Sagehorn ultimately withdrew. He is now bringing this claim for a violation of his First and Fourteenth Amendment rights by all individual defendants, a *Monell* claim against the school district, and a defamation claim against Police Chief Beahen for comments made during his investigation into Sagehorn's conduct.

Both the School Defendants and the Police Defendants have moved for judgment on the pleadings. Because the Court finds that Sagehorn has adequately pleaded each of his claims against ISD No. 728 and the individual School Defendants, the Court will deny the School Defendants' motion for judgment on the pleadings. The Court finds that Sagehorn has adequately pleaded a defamation claim against Beahen and will deny the police defendants' motion for judgment on the pleadings as to the defamation claim

against Beahen.  The Court will grant the Police Defendants' motion as to all other claims, because Sagehorn has not pleaded a sufficient nexus between Sarazin or Beahen and any alleged constitutional violations.

## BACKGROUND

### I.    PARTIES

In February 2014, Sagehorn was an honor student at Rogers High School, a member of the National Honor Society, and a four-time recipient of the Scholastic Achievement Award.  (Compl. ¶ 9, June 17, 2014, Docket No. 1.)  He was a varsity letterman in football, basketball, and baseball, as well as the named captain of the basketball team in 2012 and both the football and basketball teams in 2013.  (*Id.* ¶ 10.)  Prior to February 2014, Sagehorn had never been subject to any disciplinary actions by Rogers High School, aside from a single parking ticket.  (*Id.* ¶ 18.)  On October 11, 2013, he was admitted to North Dakota State University ("NDSU"), pending completion of all work for any remaining courses taken prior to his enrollment.  (*Id.* ¶ 19.)

Defendant ISD No. 728 is a public school district organized and operated under the laws of the State of Minnesota.  (*Id.* ¶ 11.)  Defendant Roman Pierskalla is the Principal of Rogers High School.  (*Id.* ¶ 13.)  Defendant Mark Bezek is the Superintendent of ISD No. 728.  (*Id.* ¶ 14.)  Defendant Jana Hennen-Burr ("Hennen-Burr") is the Assistant Superintendent of ISD No. 728.  (*Id.* ¶ 15.)

Defendant Jeffrey Beahen ("Beahen") is the Police Chief for Rogers Police Department.  (*Id.* ¶ 16.)  Defendant Stephen Sarazin ("Sarazin") is a police officer for

Rogers Police Department, supervised by Beahen.  (*Id.* ¶ 17.)  The Court will refer to these defendants as the "Police Defendants."

## II.     THE TWEET AND INITIAL FALLOUT

On January 26, 2014, someone anonymously posted on a website titled "Roger confessions" the following: "did @R_Sagehorn3 actually make out with [name of female teacher at Rogers High School]?"  (*Id.* ¶ 20; Aff. of Trevor Helmers ("Helmers Aff."), Ex. 1 at 1, Oct. 29, 2014, Docket No. 26.)  Sagehorn did not create or maintain the "Roger confessions" website.  (Compl. ¶ 21.)  In response, Sagehorn posted "actually yes," which he intended to be taken in jest.  (Helmers Aff., Ex. 1 at 1; Compl. ¶¶ 2223.)[1] The post was made the same day, outside of school hours and not on school grounds. (Compl. ¶ 24; Helmers Aff., Ex. 1 at 1.)  Sagehorn was not at a school-sponsored event at the time he made his post, nor did he use any school property to make the post.  (Compl. ¶ 24.)

In late January or early February, a parent of a student contacted Rogers High School to express concern about the postings.  (*Id.* ¶ 25; Am. Joint Answer of School Defs. ("Answer") ¶ 21, Feb. 5, 2015, Docket No. 58.)  Sagehorn alleges that there had been no disruption to class work or school activities as a result of the post.  (Compl.

---

[1] There is some inconsistency in the record as to whether Sagehorn's post stated "actually yes" or "actually yeah."  An undisputed screenshot of the website shows that Sagehorn's post said "actually yes."  (Helmers Aff., Ex. 1 at 1.)  Accordingly, the Court will quote Sagehorn's post as stating "actually yes."

¶ 44.)  No one mentioned the post to Sagehorn until he was summoned to the Principal's office on February 3, 2014.  (*Id.* ¶¶ 26, 30.)

## III.   SCHOOL DEFENDANTS' DISCIPLINARY ACTION

On February 3, 2014, Principal Pierskalla summoned Sagehorn to his office, where Officer Sarazin was present in full police uniform.  (*Id.* ¶ 26.)  Pierskalla and Sarazin asked Sagehorn about the website and Sagehorn's post.  (*Id.* ¶ 27.)  Sagehorn told them that he authored the post, that the post was meant to be sarcastic, and that he did not intend for anyone to believe the post to be true.  (*Id.*)

On February 5, 2014, Pierskalla summoned Sagehorn to his office a second time, with Sarazin again present in full police uniform.  (*Id.* ¶¶ 31-32.)  Pierskalla told Sagehorn that the school had decided to suspend Sagehorn for five school days.  (*Id.* ¶ 33.)  Pierskalla told Sagehorn's mother, Lori Sagehorn, that they were suspending Sagehorn because he "damaged a teacher's reputation."  (*Id.* ¶ 39.)  Pierskalla signed a notice of suspension and gave it to Sagehorn to present to his parents.  (*Id.* ¶ 37; Helmers Aff., Ex. 2.)  The notice included an attachment from page 35 of the Rogers High School Board Approved Handbook.  (Compl. ¶ 38.)  The attachment highlighted the offense of "threatening, intimidating, or assault of a teacher, administrator, or staff member," along with the recommended consequence of "3-10 day suspension; possible expulsion, police notification."  (*Id.*)

On February 10, 2014, Pierskalla called Sagehorn's parents, with Sarazin once again present.  (*Id.* ¶ 48.)  Pierskalla informed Sagehorn's parents that they had decided

to extend Sagehorn's suspension for another five school days and would be recommending expulsion through April 22, 2014 to the School Board.  (*Id.* ¶ 49.) Pierskalla did not mention any disruptions to the learning environment.  (*Id.* ¶ 50.) Sagehorn's parents informed Pierskalla that they disapproved of the decision and felt that the punishment greatly exceeded Sagehorn's mistake.  (*Id.* ¶ 62.)  Pierskalla became angry that Sagehorn's parents were questioning his authority, and informed them that the decision was final.  (*Id.* ¶ 63.)

On February 11, 2014, Lori Sagehorn sent an email to Superintendent Bezek.  (*Id.* ¶ 64.)  In the email, she requested an open hearing, asked for the authority behind the ten-week expulsion, requested an in-person meeting with Bezek, and requested that the school district interview teachers and coaches familiar with Sagehorn.  (*Id.*)  Bezek replied to Lori Sagehorn's email, explaining that he was out of town and that Assistant Superintendent Hennen-Burr would assist the Sagehorns with their concerns until he returned.  (*Id.* ¶ 65.)  Lori Sagehorn then sent Bezek a reply indicating that she would like to meet with him after his return and reiterating her frustration about Sagehorn's situation in light of his "spotless record" and "leadership, scholastic and athletic accomplishments" at the school.  (*Id.* ¶ 66.)  About an hour later, Sarazin called Lori Sagehorn and left her a voicemail telling her that he had forwarded police reports from the postings to the Hennepin County Attorney's Office for their review and decision as to whether to charge Sagehorn with any crimes.  (*Id.* ¶ 67.)

Lori Sagehorn then contacted Assistant Superintendent Hennen-Burr and set up a meeting for the morning of February 14, 2014.  (*Id.* ¶ 71.)  Along with Sagehorn and his

parents, Assistant Superintendent Hennen-Burr was present in person and Superintendent Bezek was present by telephone at the meeting on February 14. (*Id.* ¶ 72.) At the meeting, the Sagehorns expressed their view that the punishment was excessive and unwarranted. (*Id.* ¶ 73.) Bezek and Hennen-Burr disagreed. (*Id.* ¶ 74.) Bezek and Hennen-Burr represented to the Sagehorns that they could have a hearing in front of a hearing officer to contest the expulsion. (*Id.* ¶ 81.) Sagehorn alleges that Bezek and Hennen-Burr also informed the Sagehorns, however, that a hearing would be meaningless and the outcome was pre-ordained. (*Id.*) In addition, Bezek and Hennen-Burr warned the Sagehorns that the school would consider increasing the expulsion punishment through the remainder of the school year if they requested a hearing. (*Id.* ¶ 84.) Bezek and Hennen-Burr told the Sagehorns that an expulsion of any duration would likely cause NDSU to withdraw its early acceptance of Reid Sagehorn and therefore the only real option was to withdraw Sagehorn from school. (*Id.* ¶¶ 85-87.) They then presented the Sagehorns with a pre-drafted withdrawal agreement. (*Id.* ¶ 87.) Based on the representations Bezek and Hennen-Burr made during the meeting, the Sagehorns signed the withdrawal agreement. (*Id.* ¶ 89.) The Sagehorns deny that they voluntarily signed the withdrawal agreement. (*Id.* ¶ 91.)

## IV.    POLICE ACTION

Sarazin, the police liaison officer, was present during a number of meetings between Pierskalla and Sagehorn or his parents. (*Id.* ¶¶ 26, 32, 48.) Police Chief Beahen was not present for any of the meetings, but Sagehorn asserts that he regularly, publicly,

and intentionally commented to the news media about Sagehorn's conduct, stating "that's a crime" and adding that Sagehorn "could face felony charges" for the post.  (*Id.* ¶ 100.) Beahen also stated that Sagehorn's conduct was like "crying or yelling 'Fire!' in a movie theater or saying 'I got a bomb!' on a plane."  (*Id.* ¶ 101.)  Despite the fact that Sagehorn was a minor at the time of Beahen's comments, no effort was made to conceal or protect Sagehorn's identity.  (*Id.* ¶ 102.)  Ultimately, although Officer Sarazin submitted the police reports to the Hennepin County Attorney's Office, the Office determined that there was "insufficient evidence" to charge Sagehorn with a crime.  (*Id.* ¶ 70.)  Following the Office's announcement, Beahen "admitted [he] erred."  (*Id.* ¶ 104.)

## V.    PROCEDURAL HISTORY

Sagehorn filed this action in federal court on June 17, 2014.  His complaint seeks relief for First Amendment violations by all individual defendants, (*id.* ¶¶ 117-27), a supervisory liability claim against Police Chief Beahen, (*id.* ¶¶ 128-34), an unconstitutional custom and pattern of practice by ISD No. 728, (*id.* ¶¶ 135-43), Fourteenth Amendment due process violations by all individual defendants for suspending and effectively expelling Sagehorn without a meaningful opportunity to be heard to contest the actions, (*id.* ¶¶ 144-57), and defamation by Police Chief Beahen for the statements made to the Star Tribune and other news outlets suggesting that Sagehorn was a criminal and facing felony charges, (*id.* ¶¶ 158-63).  Both the School Defendants and the Police Defendants now seek judgment on the pleadings under Rule 12(c).

## DISCUSSION

## I.   STANDARD OF REVIEW

When considering a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), the Court must "'accept as true all factual allegations set out in the complaint' and . . . 'construe the complaint in the light most favorable to [the non-moving party], drawing all inferences in [their] favor.'" *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v. Rovner*, 443 F.3d 608, 610 (8th Cir. 2006)). A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *See Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). Although a complaint need not contain "detailed factual allegations," it must contain sufficient factual allegations "to raise a right to relief beyond the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In addition to the pleadings, the Court may properly consider materials that are necessarily embraced by the pleadings. *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004).

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "'claim to relief that is plausible on its face.'" *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are

merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed.  *Id*. (internal quotation marks omitted).

A motion for judgment on the pleadings must be converted to a motion for summary judgment under Rule 56 if "matters outside the pleadings are presented to and not excluded by the court."  Fed. R. Civ. P. 12(d).  A court may also consider some information which is not contained within the complaint, such as materials that are part of the public record and materials that are necessarily embraced by the pleadings, without transforming the motion into one for summary judgment.  *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).  Materials necessarily embraced by the pleadings include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003); *see also Jenisio v. Ozark Airlines, Inc. Ret. Plan for Agent & Clerical Emps.*, 187 F.3d 970, 972 n.3 (8th Cir. 1999) ("A district court may consider documents on a motion to dismiss where . . . the plaintiff['s] claims are based solely on the interpretation of the documents and the parties do not dispute the actual content of the documents."); *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997) (accepting defendant's introduction of documents on motion to dismiss because plaintiff's entire lawsuit was based on the documents and plaintiff did not dispute the content of the documents).

## II.     FIRST AMENDMENT

The complaint alleges that by disciplining Sagehorn for his post, which was neither reasonably calculated to reach the school environment nor so egregious as to pose a safety risk or other substantial disruption to the school environment, the individual defendants violated Sagehorn's First Amendment rights.   Both the School Defendants and the Police Defendants move for judgment on the pleadings on the grounds that their actions were protected by qualified immunity.   They argue that Sagehorn's speech is not protected by the First Amendment or, at minimum, his First Amendment right was not clearly established at the time of the alleged violation.   Because the Court finds that Sagehorn has adequately pleaded a violation by the individual School Defendants of a clearly established First Amendment right, the Court will deny the School Defendants' motion as to Sagehorn's First Amendment claim.   The Court will grant the Police Defendants' motion as to the First Amendment claim.   Although the Court concludes that Sagehorn's First Amendment right was clearly established, the Court finds that Sagehorn has not adequately pleaded actions constituting a violation of that right by the Police Defendants.

The First Amendment prohibits Congress and, through the Fourteenth Amendment, the States, from abridging the freedom of speech.   U.S. Const., amend. I; *Gitlow v. New York*, 268 U.S. 652, 666 (1952).   It is a bedrock principle of First Amendment jurisprudence that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."   *Texas v. Johnson*, 491 U.S. 397, 414 (1989).   First Amendment protections also apply in a school

setting.   Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).   However, the Supreme Court has recognized the needs of the States and school officials, consistent with fundamental constitutional safeguards, to prescribe a curriculum and control conduct in schools.  *Id.* at 507; *Epperson v. Arkansas*, 393 U.S. 97, 104-05 (1968).   Consequently, students have a clearly-established first amendment right to free speech both inside and outside a school setting, subject to a limited set of exceptions, several of which the individual defendants argue apply in this case.

### A.    Sagehorn's Clearly-Established First Amendment Right

#### 1.    Obscene Speech

The School Defendants maintain that the Court need not even reach the First Amendment exceptions, because Sagehorn's speech was not protected by the First Amendment.   More specifically, the School Defendants argue that Sagehorn's First Amendment claim fails because his post was obscene, and as a general rule, obscene material is not protected speech under the First Amendment.  *Kois v. Wisconsin*, 408 U.S. 229, 230 (1972).   The School Defendants are correct that courts "have long held that obscene speech – sexually explicit material that violates fundamental notions of decency – is not protected by the First Amendment."  *United States v. Williams*, 553 U.S. 285, 288 (2008).   But government officials do not have unlimited authority to regulate obscene speech.  *Interstate Circuit, Inc. v. Dallas*, 390 U.S. 676, 682-85 (1968).   In *Miller v.*

*California*, 413 U.S. 15 (1973), the Supreme Court "confine[d] the permissible scope of such regulation to works which depict or describe sexual conduct."  *Id.* at 24. Accordingly, state laws purporting to regulate such conduct must specifically define the speech or conduct to be regulated.  *Id.*

*Miller* sets out the basic guidelines for determining whether material is obscene. Under *Miller*, the trier of fact must consider:

> (a) whether the average person, applying contemporary community standards[,] would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 24 (internal quotation marks and citations omitted).  The obscenity determination is one of fact; it is not a question of law.  *Id.*; *see also Smith v. United States*, 431 U.S. 291, 300-01 (1977); *Jenkins v. Georgia*, 418 U.S. 153, 160 (1974).

These carefully delineated guidelines do not preclude public school officials from playing a role in regulating and punishing obscene speech.  On the contrary, "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse."  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986).  School districts may impose sanctions on students in response to indecent speech, because the State has a decided interest in protecting its youth from obscene and vulgar materials and speech.  *Id.* at 682, 685.  As with any other State actor, however, school district officials are bound by *Miller*'s threshold requirement that the "conduct

must be specifically defined by the applicable law, as written or authoritatively construed." *Miller*, 413 U.S. at 24.

In this case, the dispute primarily focuses on the second prong of the *Miller* test and whether there is a statute or regulation that specifically defines the school's rules concerning obscenity. The School Defendants contend that Sagehorn's post describes sexual conduct and appeals to the prurient interest because several dictionaries define "make out" as "to engage in sexual intercourse." *Merriam Webster's Collegiate Dictionary* 751 (11th ed. 2004); *see also The American Heritage Dictionary of the English Language* 1060 (5th ed. 2011) ("to have sexual intercourse"); *State v. Brown*, 792 N.W.2d 815, 822 n.2 (Minn. 2011) (citing definitions from the Merriam-Webster Collegiate Dictionary and The American Heritage Dictionary); *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1327 (8th Cir. 1984) (finding that a *Webster's* definition is appropriate to consider in identifying the meaning of a word to the general public).

Despite the School Defendants' claim that the dictionary definition should control here, the question before the Court is not how a dictionary defines the term, but rather how an average person, applying contemporary community standards, would understand the term in the context in which it appeared. It is certainly true that "[t]he dictionary definition of a word is an appropriate and relevant indication of the ordinary significance and meaning of words to the public." *WSM, Inc.*, 724 F.2d at 1327. Dictionary definitions are not statutes, however, and do not bind courts. "Make out" is slang that certainly has varying meanings, including connotations not involving sexual intercourse. Sagehorn disavows any such connotation in this instance, and nothing in his post, or the

post that prompted Sagehorn's post, or other allegations in the complaint suggest that Sagehorn was using the term to mean sexual intercourse.  (Pl.'s Resp. to Sch. Defs.' Mot. for J. on the Pleadings ("Pl.'s Resp. to Sch. Defs.") at 19, Nov. 26, 2014, Docket No. 40.) Ultimately, this is a question best left to the jury, not decided by the Court on a Rule 12(c) motion.

Further, the *Miller* exception is reserved for extreme cases.  *Miller*, 413 U.S. at 27 ("[N]o one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct . . . .").  Explicit graphic material is usually involved where courts find speech obscene as a matter of law.  *See, e.g.*, *Ginzburg v. United States*, 383 U.S. 463, 499 & n.3, (1966) (Stewart, J., dissenting); *United States v. Young*, 465 F.2d 1096, 1098-99 (9th Cir. 1972) (advertisements which consisted of pictures and textual material describing in graphic detail heterosexual intercourse and showing various homosexual relationships and acts of sexual perversion were obscene as a matter of law); *State v. Lebewitz*, 202 N.W.2d 648, 649-50 (Minn. 1972) (finding a video portraying nude couples engaged in explicit sexual intercourse to be obscene as a matter of law).  Even if the Court were to find that Sagehorn's post unambiguously referred to sexual intercourse, the content **actually attributable to Sagehorn –** a response of "actually yes" – is not nearly as graphic as the content courts have found obscene as a matter of law.  This fact is of particular significance, given that much of the governing obscenity case law arose in an earlier era when obscenity prosecutions were more routine.  As social norms and societal

standards have evolved, modern obscenity prosecutions have become less frequent and have targeted language much more vulgar than that used by Sagehorn.

The stark contrast between Sagehorn's speech and speech that would now be considered obscene is particularly evident when this case is compared to other recent obscenity cases. Sagehorn's post, for example, markedly differs from a student tweet deemed obscene in *Rosario v. Clark County School District*, 2013 WL 3679375 (D. Nev. July 3, 2013), cited by the School Defendants. In *Rosario*, the court concluded that a tweet, which was sent off-campus after a basketball game, was obscene when it expressed a hope that the basketball coach "gets fucked in tha ass by 10 black dicks."[2] *Id.* at *3. The court determined the tweet was obscene by applying the three element *Miller* test described above. *Id.* The Sagehorn tweet differs from the *Rosario* tweet in several ways. First, "gets fucked" is an unambiguous appeal to prurient interest. Unlike "make out," there is no ambiguity as to whether the *Rosario* tweet referred to sexual intercourse.

Second, the *Rosario* tweet is patently offensive. The words "fucked," "ass", and "10 black dicks," as used in the tweet, are patently offensive under an applicable state statute and "the tweet, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* The School Defendants argue that the Sagehorn post was patently offensive in light of community standards because it suggested that the teacher had

---

[2] There were a total of eight tweets, but only this tweet was ruled obscene. The court acknowledged that the remaining seven tweets **may** be racist, violent, offensive, or hateful, but the court did not make a final determination on those issues. *Rosario*, 2013 WL 3679375, at *4-*5 & n.5.

violated Minnesota's criminal sexual conduct laws.    *See* Minn. Stat. § 609.345, subd. 1(e).    The Minnesota statute refers vaguely to "sexual contact" and "sexual conduct," *id.*, but it does not define "obscene" materials; the Nevada statute cited by the *Rosario* court did.    *Rosario*, 2013 WL 3679375, at *3 n.4 (quoting Nev. Rev. Stat. § 201.235(4)).    It is clear that the School Defendants found Sagehorn's post to be inappropriate, ill-advised, and offensive, but "'the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.'"    *Snyder v. Phelps*, 131 S. Ct. 1207, 1219 (2011) (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 574 (1995)). Indeed, "'[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).    Thus, while the *Rosario* court found that the student's tweet was obscene as a matter of law, this Court makes no similar finding with respect to Sagehorn's tweet in the absence of an on-point state statute defining obscene content, despite the School Defendants' view that the post was offensive.[3]

---

[3] The School Defendants also point to the late January/early February 2014 complaint by a member of the public as evidence that the community found Sagehorn's post patently offensive. *Miller*, however, requires that speech "be judged by its impact on an average person, rather than a particularly susceptible or sensitive person." *Miller*, 413 U.S. at 33.  Without any details about the person who complained to the school about Sagehorn's post, and in light of the complaint's allegations that no one else expressed concern about the post, the Court will not treat the anonymous complaint as determinative.

The Court is not aware of a statute under which Sagehorn's post would be obscene as a matter of law – under which the content of his post is defined as obscene speech. Because the second prong of the *Miller* test is not met here, and the Court cannot conclude at this time that Sagehorn's post appealed to the prurient interest in sex under the first *Miller* prong in light of the many possible definitions of the term "make out," the Court finds that an application of the *Miller* test does not indicate that Sagehorn's post was obscene within the bounds of contemporary community standards and therefore unprotected by the First Amendment.   Consequently, the Court finds that the School Defendants were not entitled to regulate Sagehorn's speech on the grounds that it was obscene.   Sagehorn's First Amendment claim survives the argument that his speech was obscene and unprotected.

### 2.        Substantial Disruption

Next, the School Defendants argue that even if Sagehorn's speech would normally be protected under the First Amendment, his claim fails because the school district had a right to regulate his speech under specific exceptions.  Under *Tinker*, in order for school officials to justify regulating otherwise-protected on-campus speech, officials "must be able to show that [the school's regulatory] action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  *Tinker*, 393 U.S. at 509.  Where there is no showing that the student's conduct "would 'materially and substantially interfere with the requirements of

appropriate discipline in the operation of the school,' the prohibition cannot be sustained." *Id.* (citing *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).[4]

The parties appear to agree, however, that Sagehorn's post was made **off-campus**, outside of school hours.  (Compl. ¶ 24; Answer ¶ 20; Mem. in Supp. of School Defs.' Mot. for J. on the Pleadings at 12-17, Oct. 29, 2014, Docket No. 25.)  School officials' ability to regulate student speech is even more restricted once students leave the schoolhouse gates.  For example, indecent or offensive speech generally may not be regulated by school officials if delivered by a student outside of school.  *Morse v. Frederick*, 551 U.S. 393, 404-05 (2007); *Fraser*, 478 U.S. at 688 (Brennan, J., concurring).  In addition, "[s]chool officials cannot constitutionally reach out to discover, monitor, or punish any type of out of school speech" with which they disagree or that they may find offensive.  *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 765 (8th Cir. 2011).  The calculus changes, though, when a student makes serious and violent threats which substantially disrupt the school environment.  *Id.* at 765-66; *accord Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 38 (2d Cir. 2007) (applying *Tinker* standard where regulated violent speech "pose[d] a reasonably foreseeable risk that [it] would come to the attention of school authorities"

_____

[4] The Supreme Court has acknowledged three other circumstances in which school officials can regulate free speech.  Student speech may be regulated if the speech is vulgar, lewd, or plainly offensive.  *Fraser*, 478 U.S. at 683.  Student speech may also be regulated if it is school-sponsored speech.  *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).  Finally, student speech may be regulated if it supports drug use at a school event.  *Morse v. Frederick*, 551 U.S. 393, 403 (2007).  The School Defendants make arguments invoking *Fraser*, and the Court will address those below.  The other two circumstances are not at issue in this case, as Sagehorn's speech was neither school-sponsored nor related to drug use.

and also caused a material and substantial disruption to "the work and discipline of the school" (internal quotation marks omitted)).

The general rule is that off-campus statements are "protected under the First Amendment and not punishable by school authorities unless they are true threats or are reasonably calculated to reach the school environment **and** are so egregious as to pose a serious safety risk or other substantial disruption in that environment." *R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist.*, 894 F. Supp. 2d 1128, 1140 (D. Minn. 2012); *see also D.J.M.*, 647 F.3d at 765. Therefore, to regulate a student's off-campus speech, school officials must first demonstrate that the speech falls under the "true threat" exception or the "substantial disruption" exception. *R.S.*, 894 F. Supp. 2d at 1140. Neither the School Defendants nor the Police Defendants are contending that Sagehorn's speech constituted a "true threat,"[5] so the Court must determine whether Sagehorn's speech falls under the "substantial disruption" exception.

A school may only regulate speech under the "substantial disruption" exception if the speech is both (1) reasonably calculated to reach the school environment **and** (2) so

---

[5] Nor does the Court find that Sagehorn's speech could have been considered a "true threat." "[A] 'true threat' is defined as a 'statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another.'" *United States v. Mabie*, 663 F.3d 322, 330 (8th Cir. 2011) (quoting *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002) (en banc)). The Eighth Circuit has invoked Columbine and Jonesboro and characterized "true threats" as statements expressing violence unequivocally directed at another individual or containing "violent and disturbing content." *Riehm v. Engelking*, 538 F.3d 952, 963-64 (8th Cir. 2008) (quoting *Pulaski*, 306 F.3d at 626-27 & n.4); *see also*, *D.J.M.*, 647 F.3d at 758 (student sent chat messages from home to a classmate talking about shooting specific students); *Pulaski Cnty.*, 306 F.3d at 619 (student showed a classmate two letters expressing a desire to rape, sodomize, and murder his ex-girlfriend). Sagehorn's post of "actually yes" in response to a question about whether he had made out with a teacher at the school is a far cry from this type of violent or depraved sentiment.

egregious as to pose a serious safety risk or other substantial disruption in that environment. *R.S.*, 894 F. Supp. 2d at 1140. The fact that a statement may have been reasonably calculated to reach a school audience is not sufficient: school officials must also show that the statements posed a substantial disruptive effect. *Id.* This is an extremely high bar: "[c]ourts have applied such an exception sparingly, applying it only to the most violent and threatening forms of speech and consistently declining to expand it to extremely offensive but nonviolent out-of-school speech." *Id.*

Two Third Circuit cases, discussed in *R.S.*, demonstrate this point. The first is *Layshock v. Hermitage School District*, 650 F.3d 205 (3d Cir. 2011) (en banc). In *Layshock*, a high school senior created a fake profile of his principal, where he posted that the principal used steroids, smoked marijuana, and was an alcoholic. *Id.* at 207-08. The joke "spread like wildfire," leading to more students making similar profiles and school disciplinary action against those students. *Id.* at 208. Despite this substantial social impact on the student body, the court ruled that the school district was "not empowered to punish [the student's] out of school expressive conduct" because that conduct did not "result[] in foreseeable and substantial disruption of the school." *Id.* at 219.

The second case is *J.S. ex rel. Snyder v. Blue Mountain School District*, 650 F.3d 915 (3d Cir. 2011) (en banc), filed the same day as *Layshock*. In *J.S.*, an honor roll eighth grade student created a fake MySpace profile of the principal, on which she accused the principal of hitting on students and parents and having sex in his office. *Id.* at 920. The school district moved for summary judgment, stating that the profile

disrupted the school by (1) causing "rumblings" in the school about the profile, (2) forcing teachers to ask students to stop discussing the profile, and (3) requiring the guidance counselor to cancel a number of counseling appointments so that she could meet with the principal, the student, and her mother. *Id.* at 922-23. Despite these alleged interruptions, the Third Circuit affirmed the district court's determination that "no substantial and material disruption" had occurred. *Id.* at 923 (internal quotation marks omitted). "[B]eyond general rumblings, a few minutes of talking in class, and some officials rearranging their schedules to assist [the principal] in dealing with the profile, no disruptions occurred." *Id.* at 929. Comparing the case to *Tinker*, the court stated that "[i]f *Tinker*'s black armbands . . . could not reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, neither can [the student's] profile, despite the unfortunate humiliation caused for [the principal]." *Id.* at 929-30 (internal quotation marks and citation omitted). Therefore, "the School District violated [the student]'s First Amendment free speech rights when it suspended her for speech that caused no substantial disruption in school and that could not reasonably have led school officials to forecast substantial disruption in school." *Id.* at 925.

In this case, the School Defendants argue that Sagehorn's post was not protected by the First Amendment because it was foreseeable that his speech would reach the school environment and cause a substantial disruption. More specifically, the School Defendants maintain that the post, suggesting a physical relationship between a teacher and a student, was directed at the school and likely to cause a disruption in the school

environment.  First, the Court observes that the fact that speech references teacher-on-student sexual conduct does not, *de facto*, make the speech likely to reach the school and cause a substantial disruption.  *See Bell v. Itawamba Cnty. Sch. Bd.*, 774 F.3d 280, 283-85, 295-97, 304 (5th Cir. 2014) (holding, where a student created a rap off-campus about two male coaches sexually harassing female students, that the "substantial disruption" exception in *Tinker* "would not afford the School Board a defense for its violation of [the student]'s First Amendment rights because the evidence does not a support a finding, as would be required by *Tinker*, that [the student]'s song either substantially disrupted the school's work or discipline or that the school officials reasonably could have forecasted such a disruption").

Second, Sagehorn has alleged that there was no disruption to the school environment in this case.  The School Defendants insist that it was "reasonably foreseeable that the speech [would] reach the school community and cause a substantial disruption to the educational setting."  *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 777 (8th Cir. 2012).  Even if the Court assumes, without deciding, that Sagehorn's post was intended to reach the school environment, there is no indication that any disruption was, in fact, caused by Sagehorn's post.  Both this case and *S.J.W.* involved student posts on an external website, but in *S.J.W.*, the court found in the context of a preliminary injunction analysis that the students' posts caused a considerable disruption at the school on a particular day.  *Id.* at 778.  The court found, accordingly, that *Tinker* was likely to apply because the speech had caused a substantial disruption. *Id.*  In this case, on the other hand, the complaint alleges that "[t]here was no disruption

to class work or school activities as a result of Reid's post," (Compl. ¶ 44), and on a motion for judgment on the pleadings, the court is bound to accept the complaint's factual allegations as true, *Braden*, 588 F.3d at 594.  Based on the allegations in the complaint, "there was no commotion, boisterous conduct, interruption of classes, or any lack of order, discipline and decorum at the school, as a result of [Sagehorn]'s posting of ["actually yes"] on the Internet." *Bell*, 774 F.3d at 296.  If proven true, these allegations would support the conclusion that the School Defendants were not permitted to regulate Sagehorn's speech.

For example, in *Layshock*, the Eighth Circuit noted that the district court had found that the student's conduct did not result in a substantial disruption, and the school therefore could not regulate the student's speech. *Layshock*, 650 F.3d at 219.  Just as in this case, the expressive conduct occurred outside the schoolhouse gate, and in the absence of a substantial disruption, the school was not permitted to punish the speech. *Id.* Likewise, in *J.S.*, the Eighth Circuit remarked that it could not "apply *Tinker*'s holding to justify the School District's actions," because "[t]he facts simply to do not support the conclusion that the School District could have reasonably forecasted a substantial disruption of or material interference with the school." *J.S.*, 650 F.3d at 929-31. Although the Court is not concerned at this stage with whether the facts show that there was a substantial disruption, the Court will reach a similar conclusion to the courts in *Layshock* and *J.S.* – that *Tinker* and *Fraser* do not permit the School Defendants to punish Sagehorn for off-campus speech in the absence of a substantial disruption, and at

this point, Sagehorn's allegation that there was no substantial disruption will suffice to defeat a motion for judgment on the pleadings.

### 3.     Lewd and Vulgar Speech

Next, the School Defendants maintain that they were also entitled to regulate Sagehorn's speech because it was lewd and constituted harassment to the teacher identified in the post.   Under *Fraser*, schools may discipline on-campus speech that is vulgar, lewd, or plainly offensive.   *Fraser*, 478 U.S. at 683.   The Supreme Court has acknowledged limitations on the otherwise absolute interest of a speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children.   *Ginsberg v. New York*, 390 U.S. 629, 636 (1968).   In the school context, the Court emphasized that a school may "insist[] that certain modes of expression are inappropriate and subject to sanctions."   *Fraser*, 478 U.S. at 683.[6]   The Court differentiated *Fraser*'s rule for vulgar speech from *Tinker*'s standard for political speech, stating that it is "perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech . . . is wholly inconsistent with the 'fundamental values' of public school education."   *Id.* at 685-86.

---

[6] It is arguable that courts must defer to certain decisions made by school administrators in the realm of "vulgar" school speech.  *Pyle by and through Pyle v. S. Hadley Sch. Comm.*, 861 F. Supp. 157, 159 (D. Mass. 1994).  Any deference to a school administrator would be limited to in-school rhetoric.  *Id.* ("On questions of coarseness or ribaldry **in school**, federal courts do not decide how far is too far." (emphasis added)).  Because Sagehorn's speech was not made in the school setting, the Court concludes that deference is inappropriate in this case.

While *Fraser* offers school officials significant discretion to define "vulgar" speech delivered on school grounds, *Fraser* is clearly limited to on-campus speech. The Supreme Court stated that such discipline is restricted to "[t]he determination of what manner of speech **in the classroom or in school assembly** is appropriate." *Id.* at 683 (emphasis added). The goal in granting teachers and school officials this degree of discretion is to enable schools to strike the proper balance between "[t]he undoubted freedom to advocate unpopular and controversial views" and "society's countervailing interest in teaching students the boundaries of socially appropriate behavior." *Id.* at 681. Nothing about the Supreme Court's decision in *Fraser* suggests that the same considerations would extend beyond the boundaries of the schoolyard. Indeed, the decision emphasized the limitations of this policy rationale by stating that "**[a] high school assembly or classroom** is no place for a sexually explicit monologue . . . ." *Id.* at 685 (emphasis added).

Citing a Fourth Circuit case, the School Defendants argue that this Court should extend *Fraser* to off-campus speech because the speech was expressly direct at the school. *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 573 (4th Cir. 2011). In *Kowalski*, a student created a MySpace group named "Students Against Sluts Herpes," which was dedicated to ridiculing one particular student. *Id.* at 567-68. The student also invited 100 other students at the high school to join the group, and another student added photos to the group's MySpace page from a school computer that suggested that the targeted student had herpes. *Id.* The targeted student discovered the page and refused to attend classes the next day. *Id.* The Fourth Circuit found that the school was authorized

to regulate the speech because it was "materially and substantially disruptive" to the school environment.  *Id.* at 573-74.

The Court concludes that *Kowalski* offers little support for the School Defendants. The Fourth Circuit explicitly declined to resolve whether the student's speech "occurred" outside the schoolhouse gates but was directed at in-school speech, thereby falling under *Tinker* and *Fraser*.  *Id.* at 573.  Instead, the court chose not to reach that question because the case was resolvable on the issue of substantial disruption.  *Id.* at 573-74.  Although the student's speech in *Kowalski* started off school grounds, the page was designed to bully and harass another student by generating chatter among "invited" students at the high school, and it had precisely that effect – the student's speech did, in fact, "create[] a reasonably foreseeable substantial disruption."  *Id.* at 574.  As the Court has already explained, Sagehorn alleges that there was no disruption to the school environment, and the Court must accept that allegation as true at this stage in the litigation.  Thus, the court's conclusion in *Kowalski* does not support the School Defendants' argument that the Court should find the school's regulation of Sagehorn's speech permissible because it was directed at the school, even if made off-campus.[7]

_____

[7] The School Defendants also cite *Kowalski* for the proposition that Sagehorn's speech was "harassing" and thus not protected by the First Amendment.  The Court will reject this argument.  First, Sagehorn's post stated "actually yes," which is a far cry from the speech in *Kowalski*, which included pictures and mean-spirited allegations that another student had a venereal disease and was sexually promiscuous.  *Kowalski*, 652 F.3d at 567-68.  Second, Sagehorn has alleged that the post was not intended to be taken seriously, and the Court must accept as true his allegation that the post was sarcastic and meant in jest.  The student in *Kowalski* made no such disclaimer.  Therefore, the Court does not find that Sagehorn's speech is unprotected as a result of being "harassing" speech.

Further, even if the court in *Kowalski* had reached the question of whether the student's speech was "directed at" the school environment, the Court is not persuaded that Sagehorn's speech was expressly directed at the school merely because it related to an individual at the school.  Certainly, in *Kowalski*, where the Court was concerned about "protecting the well-being and educational rights of its students," *id.* at 571, the school has greater latitude in taking disciplinary steps to protect those students.  Numerous other cases have rejected the school's regulation of off-campus speech, however, even where the speech targeted an individual connected to the school.  *E.g.*, *Bell*, 774 F.3d at 283-85, 304 (explaining that, assuming without deciding that *Tinker* applied, the school board would have no defense for its punishment of a student for a rap accusing school coaches of sexual harassment where the rap was posted on the internet off campus, during non-school hours, and caused no substantial disruption to the school's work or discipline); *R.S.*, 894 F. Supp. 2d at 1133-34, 1140-41 (finding that a student had pled an adequate First Amendment violation where the school punished her for off-campus internet posts about a hall monitor at the school); *Rosario*, 2013 WL 3679375, at \*3-\*4 (concluding that a student had sufficiently pleaded a First Amendment violation where the school punished him for off-campus tweets targeting the school basketball coach).

In *Morse*, the Supreme Court was clear that "[h]ad [the student in *Fraser*] delivered the same speech in a public forum outside the school context, it would have been protected [by the First Amendment]."  *Morse*, 551 U.S. at 405.  As in *Rosario*, Fraser's speech was characterized by explicit sexual content, and it referred to a particular individual connected to the school environment – in *Fraser*, a student running

for school government office.  *Fraser*, 478 U.S. at 677-78.  Thus, the Court concludes that Sagehorn's allegations, if accepted as true, state a sufficient First Amendment claim. The Court will not find that the post directly targeted the school and was therefore subject to school regulation, merely because it referenced a teacher at the school.

In sum, the Court concludes that Sagehorn has adequately pleaded a First Amendment claim.  The School Defendants have not demonstrated that Sagehorn's speech caused a substantial disruption, was obscene, was lewd or vulgar, or was harassing.  Therefore, the School Defendants have not defeated Sagehorn's claim by showing that they were permitted to regulate his speech.

### 4.  Police Defendants and Speech Claims

While the Court concludes that Sagehorn has adequately pled a First Amendment claim against the School Defendants, the Court observes that the complaint does not contain allegations sufficient to connect the Police Defendants to any alleged First Amendment violation.  The alleged First Amendment violation took place at the school, and nowhere in the complaint does Sagehorn contend that Police Chief Beahen had a relationship with the school such that he was a decisionmaker or had any influence over the school's handling of the post.  Sagehorn does allege that Sarazin was present at the meetings with Pierskalla, but the complaint does not plead facts to support a finding that Sarazin was empowered to discipline Sagehorn for his conduct or that he had authority to act for the school in suspending Sagehorn.  Although Sarazin was in the room during these meetings, the Court finds that the complaint does not sufficiently allege any

constitutional violations on his part.   Therefore, the Court will grant the Police

Defendants' motion for judgment on the pleadings as to the First Amendment claim.

### B.      Qualified Immunity

The School Defendants argue that even if the Court finds that Sagehorn has

adequately pled a First Amendment claim, the individual district officials cannot be held

liable because they are entitled to qualified immunity.   The qualified immunity analysis

involves two questions: whether the facts, as alleged by the plaintiff, establish a violation

of a constitutional right, and whether the constitutional right was clearly established at the

time the defendant allegedly violated the right.   *Pearson v. Callahan*, 555 U.S. 223, 232-

42 (2009) (clarifying that these two questions, first mandated by the Supreme Court in

*Saucier v. Katz*, 533 U.S. 194, 201 (2001), comprise the qualified immunity test but need

not be applied in any particular order); *Burke v. Sullivan*, 677 F.3d 367, 371 (8th Cir.

2012) ("To defeat a defense of qualified immunity, a plaintiff must show: (1) the facts,

viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a

constitutional or statutory right; and (2) the right was clearly established at the time of the

deprivation." (internal quotation marks omitted)).   A right is "clearly established" if "a

reasonable official would understand that what he is doing violates that right."   *Jones v.

McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012) (internal quotation marks omitted).   The

purpose is to "give[] government officials breathing room to make reasonable but

mistaken judgments about open legal questions."   *Ashcroft v. al-Kidd*, 131 S. Ct. 2074,

2085 (2011).

The School Defendants argue that Sagehorn's post did not fall within a clearly established right.  They maintain that off-campus speech is a complex and ill-defined area, particularly where the internet complicates the campus boundaries.  *J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1125 (C.D. Cal. 2010) ("The Supreme Court has yet to address whether off-campus speech posted on the Internet, which subsequently makes its way to campus either by the speaker or by any other means, may be regulated by school officials.").  The School Defendants point out, for example, that the Minnesota legislature actually requires schools to discipline students for "cyberbullying," even when it occurs off-campus, leading to confusion over the scope of off-campus conduct schools may regulate.   Minn. Stat. § 121A.031, subd. 1(a)(3).  Accordingly, the School Defendants insist that Sagehorn did not have a clearly established right that the officials' actions violated, and they are thus protected by qualified immunity.

While the internet may pose new challenges, it did not change the law.  "[T]he general rule that schools may not regulate merely inappropriate out-of-school speech (as opposed to truly threatening or substantially disruptive speech) has been well-established for decades."  *R.S.*, 894 F. Supp. 2d at 1140.  Nothing about the context of Sagehorn's tweet – as alleged in the complaint – suggests that Sagehorn's speech falls into the nebulous realm of off-campus speech on the internet that makes its way onto campus.  According to the complaint, Sagehorn's speech took place entirely off school grounds, and there was no disruption to the school environment as a result of the post.  (Compl. ¶¶ 24, 44.)   The Court accepts these allegations as true for the purposes of this 12(c)

motion for judgment on the pleadings.  Therefore, at this stage, the Court is not persuaded by the School Defendants' argument that this was a murky area of speech.

The School Defendants do not get the benefit of the doubt merely because the Supreme Court has not specifically authored a decision on this issue.  In fact, "[t]he Supreme Court has made it clear that there need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate the constitution."  *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 531 (8th Cir. 2009) (internal quotation marks omitted).  Indeed, general statements of the law, such as those announced by the Supreme Court in *Tinker* with respect to school officials' regulation of student speech, are fully capable of giving "'fair and clear warning'" to officials that particular actions are unlawful.  *Morris III v. Zefferi*, 601 F.3d 805, 812 (8th Cir. 2010) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).  Further, the Eighth Circuit takes a broad view of the "clearly established" inquiry, allowing courts to consider "all available decisional law including decision of state courts, other circuits and district courts."  *Hayes v. Long*, 72 F.3d 70, 73-74 (8th Cir. 1995) (quoting *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 291 (8th Cir. 1993)).

The law is sufficiently clear that on facts such as the complaint alleges in this case – a student using personal property to make non-threatening speech off-campus, that in no way impacts or disrupts the school environment – a student would have a clearly established right to free speech.  The Court further concludes that a reasonable officer or school official would understand that punishing such speech would violate the student's clearly-established right.  Therefore, the Court finds that the School Defendants are not

entitled to qualified immunity on Sagehorn's First Amendment claim. The Court will accordingly deny the School Defendants' motion for judgment on the pleadings as to Sagehorn's First Amendment claim.

## III. FOURTEENTH AMENDMENT

The Due Process Clause of the Fourteenth Amendment forbids states from "depriv[ing] any person of life, liberty, or property without due process of law . . . ." U.S. Const. amend. XIV, § 1. To prevail on a procedural due process claim, a plaintiff must establish: (1) that he was deprived of a life, liberty or property interest protected by the Fourteenth Amendment, and (2) that he was deprived of that interest without being provided sufficient process. *Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 902 (8th Cir. 2000); *Clark v. Kansas City Mo. Sch. Dist.*, 375 F.3d 698, 701 (8th Cir. 2004).

In general, property interests are created by state law, not by the United States Constitution. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Under the Minnesota Constitution, the state is required to maintain a system of public schools that is "general and uniform," as well as "thorough and efficient . . . ." Minn. Const. art. XIII, § 1. As part of that system, children between the ages of 7 and 17 are required to attend school. Minn. Stat. § 120A.22, subd. 5. Minnesota courts have construed these requirements as guaranteeing students a property interest in public education that is protected by the Fourteenth Amendment. *J.K. ex rel. Kaplan v. Minneapolis Pub. Schs.*, 849 F. Supp. 2d 865, 871 (D. Minn. 2011); *In re Expulsion of N.Y.B.*, 750 N.W.2d 318, 327 (Minn. Ct. App. 2008) ("Education is a fundamental right in Minnesota, as well as a

property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (citations omitted)).

Because students have a property interest in public education, "students facing suspension [or expulsion] and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Goss v. Lopez*, 419 U.S. 565, 579 (1975). Minnesota enacted the Pupil Fair Dismissal Act, Minn. Stat. §§ 121A.40-.575, to codify the due process standards applicable to dismissal of students from public schools into statutory law. Section 121A.47, subdivision 1, states that "[n]o exclusion or expulsion shall be imposed without a hearing, unless the right to a hearing is waived in writing by the pupil and parent or guardian." Broadly, the statute establishes that "[n]o public school shall deny due process or equal protection of the law to any public school pupil involved in a dismissal proceeding which may result in suspension, exclusion, or expulsion." Minn. Stat. § 121A.42.

The statute applies to "dismissals," which are defined as "the denial of the current educational program to any pupil, including exclusion, expulsion, and suspension. It does not include removal from class." Minn. Stat. § 121A.41, subd. 2. The statute also clarifies that "'[e]xpulsion' means a school board action to prohibit an enrolled pupil from further attendance for up to 12 months from the date the pupil is expelled." *Id.*, subd. 5.

The statute identifies three permissible grounds for dismissal:

(a) willful violation of any reasonable school board regulation. Such regulation must be clear and definite to provide notice to pupils that they must conform their conduct to its requirements;

(b) willful conduct that significantly disrupts the rights of others to an education, or the ability of school personnel to perform their duties, or school sponsored extracurricular activities; or

(c) willful conduct that endangers the pupil or other pupils, or surrounding persons, including school district employees, or property of the school.

Minn. Stat. § 121A.45, subd. 2.  In the event a school chooses to invoke its authority to dismiss a student for one of the enumerated reasons, the student is entitled to a hearing that "shall take place before: (1) an independent hearing officer; (2) a member of the school board; (3) a committee of the school board; or (4) the full school board; as determined by the school board.  The hearing shall be conducted in a fair and impartial manner."  Minn. Stat. § 121A.47, subd. 6.

Although Sagehorn was suspended, Sagehorn's Fourteenth Amendment claim is focused on expulsion.[8]  The School Defendants argue that Sagehorn cannot allege a procedural due process claim with respect to an "expulsion," because he was not technically expelled – Sagehorn and his parents signed a voluntary withdrawal agreement.  The School Defendants suggest that to construe Sagehorn's withdrawal as an expulsion would be to give Sagehorn "the benefit of unreasonable inferences, or those at war with the undisputed facts."  *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651 (8th Cir. 1989) (internal quotation marks omitted).  Sagehorn has alleged in his complaint, however, that his withdrawal was not voluntary.  Rather,

---

[8] In the case of a "short suspension"—ten days or fewer—a school only needs to provide a student with notice of the charges against the student, along with an opportunity for the student to present his or her version of events.  *Goss*, 419 U.S. at 581-82.  As it appears these were provided to Sagehorn for each of his two brief suspensions, the Court will focus on the "constructive expulsion" argument Sagehorn advances.

Sagehorn alleges that Bezek and Hennen-Burr represented to him that his expulsion was pre-ordained and that a formal hearing before an impartial hearing officer on the matter would make no difference. Sagehorn also alleges that Bezek and Hennen-Burr warned the Sagehorns that an expulsion could affect Sagehorn's attendance at the North Dakota State University, and threatened to extend the expulsion to the end of the year if he requested a hearing.

While the School Defendants focus on the distinction between an "expulsion" and a "withdrawal," the label is not dispositive here. The question before the Court is whether the School Defendants interfered with Sagehorn's right to a public education without providing him adequate process, or whether Sagehorn freely and voluntarily removed himself from the school district before such process was required. "Although due process rights may be waived, a waiver of constitutional rights is not effective unless the right is intentionally and knowingly relinquished." *Davis Oil Co. v. Mills*, 873 F.2d 774, 787 (5th Cir. 1989). In order to meet this requirement, a waiver must be (1) "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (internal quotation marks omitted). In this case, the first requirement is not met. Sagehorn alleges that he was coerced and intimidated into withdrawing, and therefore he did not waive his right to procedural due process. Because the Court accepts these allegations as true for a motion for judgment on the pleadings, the Court finds that Sagehorn has adequately pleaded a violation of his property interest in public education.

Thus, Sagehorn has adequately pleaded a Fourteenth Amendment claim against the School Defendants.  The Court will therefore deny the School Defendants' motion for judgment on the pleadings as to the Fourteenth Amendment claim.

On the other hand, the Court finds that the complaint does not include sufficient allegations to state a Fourteenth Amendment claim against the Police Defendants. Sagehorn alleges that Sarazin was present at the early suspension meetings with Pierskalla, but the complaint does not identify any ways in which Sarazin contributed to a violation of Sagehorn's right to a public education.  Neither Sarazin nor Beahen is mentioned in the complaint in connection with the "constructive expulsion" allegations. Although the officers are mentioned in connection with an investigation into potential criminal charges against Sagehorn, nothing in the complaint indicates that the officers played a role in allegedly violating Sagehorn's property right to education under the Fourteenth Amendment.  Accordingly, the Court will grant the Police Defendants' motion for judgment on the pleadings as to the Fourteenth Amendment claim.[9]

---

[9] Count II of Sagehorn's complaint alleges a failure to supervise against Police Chief Beahen, based on alleged violations of Sagehorn's rights by Sarazin.  To state a failure-to-supervise claim under 42 U.S.C. § 1983, a plaintiff must show that a supervising officer:

1) Received notice of a pattern of unconstitutional acts committed by subordinates;

2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts;

3) Failed to take sufficient remedial action; and

4) That such failure proximately caused injury to [the plaintiff].

(Footnote continued on next page.)

## IV.   *MONELL* CLAIM

Count III of Sagehorn's complaint alleges that ISD No. 728 engaged in a pattern or practice of violating students' First Amendment rights – otherwise known as *Monell* claim.  (Compl. ¶¶ 135-43.)  A school district cannot be held liable solely because one of its employees violates a student's federally-protected rights.   A school district may, however, be liable under 42 U.S.C. § 1983 if it "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 692 (1978)).  "A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law."  *Ware v. Jackson Cnty., Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (internal quotation marks omitted).

Sagehorn is alleging a "custom or usage," which a plaintiff can establish in one of three ways:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

_____

(Footnote continued.)

*Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010) (quoting *Jane Doe A. v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 645 (8th Cir. 1990)).

Because the Court concludes that Sagehorn has not adequately pleaded a claim against Sarazin for any violation of Sagehorn's constitutional rights, the first requirement of a failure-to-supervise claim is not met.  Accordingly, the Court will also dismiss Count II, the failure-to-supervise claim against Beahen.

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

*Jane Doe A. v. Spec. Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 646 (8th Cir. 1990).   In addition, a *Monell* claim requires that the plaintiff's federal rights have been violated and that the custom or policy actually caused the plaintiff's harm.   *Anderson v. City of Hopkins*, 805 F. Supp. 2d 712, 722-23 (D. Minn. 2011).

Sagehorn bases his *Monell* claim against ISD No. 728 on the allegation that the school not only punished **him** for off-campus speech, but that the school also reached out to punish at least two other students for speech made while not on school grounds. Sagehorn maintains that this constitutes a custom of punishing students for off-campus communications that are neither "true threats" nor a "substantial disruption" to the academic environment.   The School Defendants argue that Sagehorn has not adequately pled a *Monell* claim because his complaint contains "only boilerplate allegations asserting the mere generic elements of a *Monell* claim without any factual allegations specific to this case."   *D.B. v. Hargett*, No. 13-2781, 2014 WL 1371200, at *6 (D. Minn. Apr. 8, 2014).   "[V]ague and conclusory" allegations under *Monell* cannot survive a Rule 12(c) motion.   *Triemert v. Washington Cnty.*, No. 13-1312, 2013 WL 6729260, at *12 (D. Minn. Dec. 19, 2013).

In this case, the Court finds that Sagehorn has gone beyond merely alleging the boilerplate requirements of a *Monell* claim and has asserted that the School Defendants had a specific policy of punishing constitutionally-protected off-campus speech, as evidenced by their treatment of Sagehorn's post and speech by at least two others students. (Compl. ¶ 45.)   In *D.B.*, the complaint only alleged, in generic terms, that "the School District maintained a policy, pattern, practice, and/or custom of inadequately and improperly training, supervising, and disciplining school bus drivers," with no facts to indicate what that policy or custom was.  *D.B.*, 2014 WL 1371200, at *5-*6.  Likewise, in *Triemert*, the complaint was limited to a vague allegation that "[i]t was the policy and/or custom of [the county] to inadequately supervise or train its employees . . . ." *Triemert*, 2013 WL 6729260, at *12.

Sagehorn's complaint is not so generic.   The Court concludes, instead, that Sagehorn's allegations are much more akin to those raised in *R.S.*, where the complaint alleged that school officials had committed a specific constitutional violation against both the plaintiff **and other students**, "on multiple occasions, under circumstances similar to those alleged [in the complaint]."  *R.S.*, 894 F. Supp. 2d at 1137.   The basis for the plaintiff's allegations was a series of conversations with other affected students.  *Id.*  The allegations in *R.S.* are virtually identical to Sagehorn's complaint, which states:

> Based on the Sagehorns' discussions with other parents, Rogers High School and ISD No. 728 have reached out to discipline at least two other students and perhaps more for out-of-school speech that was neither a 'true threat' of physical violence nor reasonably calculated to reach the school environment and so egregious as to pose a serious safety risk or other substantial disruption to that environment.

(Compl. ¶ 45.)  Faced with very similar language, the court in *R.S.* found that "[t]he facts alleged in the complaint are more than bare legal conclusions."  *R.S.*, 894 F. Supp. 2d at 1137.

The School Defendants argue that even if Sagehorn's complaint identifies these two other instances as part of a custom, "two instances of misconduct . . . do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy . . . ."  *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996).  There is an important distinction between the Eighth Circuit's decision in *Andrews* and this case: *Andrews* arose in the context of a summary judgment motion.  *Id.* at 1074, 1080.  There, the evidence indicated that there were, in fact, only two instances of misconduct.  *Id.* at 1075-76.  In contrast, this case is only at the pleadings stage.  "When a complaint is filed, a plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right." *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003).  But the "liberality" of the pleading standard means that "the failure . . . to specifically plead the existence of an unconstitutional policy or custom, in itself, is not fatal to [a plaintiff's] claim for relief."  *Id.*  Even if a plaintiff cannot identify the full scope of an alleged custom or policy, the key to surviving dismissal is that the "complaint must allege facts which would support the existence of an unconstitutional policy or custom."  *Id.*

Along these lines, the court in *R.S.* found an adequately-pleaded *Monell* claim where the complaint merely alleged violations involving "other students," explaining that "[w]hile the school defendants correctly point out that liability for an unconstitutional

custom or usage . . . cannot arise from a single act, Plaintiffs have alleged more than a single act here." *R.S.*, 894 F. Supp. 2d at 1137-38 (internal quotation marks, alterations, and citation omitted).   Similarly, Sagehorn has alleged more than a single act in this case by alleging School Defendants have disciplined "at least two other students and perhaps more" for out-of-school speech.   (Compl. ¶ 45.)   At this point, accepting Sagehorn's allegations as true, the Court concludes that Sagehorn has identified a possible custom in his complaint, which is sufficient to survive a Rule 12(c) motion.   Thus, the Court will deny the School Defendants' motion for judgment on the pleadings as to Count III of Sagehorn's complaint.

## V.      DEFAMATION

In Count V of the complaint, Sagehorn alleges defamation against Police Chief Beahen.   (Compl. ¶¶ 158-63.)   Under Minnesota law, a defamation claim requires a plaintiff to show "that a statement was false, that it was communicated to someone besides the plaintiff, and that it tended to harm the plaintiff's reputation and to lower him in the estimation of the community."   *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 410 (Minn. 1994).   The basis of Sagehorn's defamation claim is that Beahen "regularly, publicly, and intentionally commented to the news media about Reid's conduct, stating 'that's a crime' and ominously adding that Reid 'could face felony charges.'"   (Compl. ¶ 100.)   The complaint claims that Beahen "recklessly and falsely publicly stated that Reid's conduct was like 'crying or yelling "Fire!" in a movie theater or saying "I got a bomb!" on a plane.'"   (*Id.* ¶ 101.)   Sagehorn alleges that "[t]hese

defamatory statements about Reid Sagehorn were made to the Star Tribune newspaper and other media outlets and were subsequently published by media outlets on a national and international scope." (*Id.* ¶ 161.)

Beahen argues that Sagehorn's allegations merely quote statements from news reports and not Beahen's specific words, and do not adequately allege which media sources were involved. As a result, Beahen argues that the pleadings do not give him proper notice of which statements were allegedly defamatory.

At the pleading stage, a plaintiff must allege "a defamation claim with a certain degree of specificity, including pleading who made the alleged defamatory statement, to whom the statements were made, and where the statements were made." *Magee v. Trs. of the Hamline Univ., Minn.*, 957 F. Supp. 2d 1047, 1074 (D. Minn. 2013), *aff'd*, 747 F.3d 532 (8th Cir. 2014). Under Minnesota law, courts generally require that a plaintiff allege verbatim the words constituting the defamatory statement. *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000). This level of specificity is in keeping with the federal courts' preference for "specific pleading of defamation claims because 'knowledge of the exact language used is necessary to form responsive pleadings.'" *Bauer v. Ford Motor Credit Co.*, No. 00-389, 2000 WL 34494820, at *3 (D. Minn. June 27, 2000) (quoting *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8th Cir. 1979)). The purpose of the specificity requirement is to provide sufficient specificity for a court to evaluate whether a privilege applies, as well as to put defendants on notice of the scope of the defamation claim. *Walker v. Wanner Eng'g, Inc.*, 867 F. Supp. 2d 1050, 1056 (D. Minn. 2012).

With these parameters in mind, the Court concludes that Sagehorn's complaint adequately pleads a defamation claim against Beahen.  Sagehorn's complaint identifies specific quotations by Beahen – for example, that Sagehorn's post was like "crying or yelling 'Fire!' in a movie theater or saying 'I got a bomb!' on a plane" – and at least one specific media outlet to which allegedly defamatory statements were made – the Star Tribune.  (Compl. ¶ 101.)  Sagehorn's complaint does not include lengthy quotations or full context for the statements, but they are much more specific than, for example, in *Magee*, where the plaintiff alleged that the defamatory statements were "those found in the Hearing Committee determination," with no further specificity.  *Magee*, 957 F. Supp. 2d. at 1074 (internal quotation marks omitted).  Sagehorn does not generically allege that Beahen's problematic statements were "those found in the newspapers or other television news stories."  Rather, the complaint quotes some of Beahen's statements with sufficient specificity to enable Beahen to file a responsive pleading, admitting or denying that he made the particular statements alleged in the complaint, to the sources identified in the complaint.  Further, although Beahen asserts that the complaint is too vague to enable him to identify the news reports Sagehorn quotes, during oral argument on Beahen's motion for judgment on the pleadings, Beahen's counsel offered to play for the Court the exact Fox 9 news video containing the alleged defamatory statements identified in the complaint.  Therefore, the Court finds that the complaint gave Beahen sufficient information to identify the relevant statements and news reports.

Beahen also argues that the statements cannot be defamatory because his statements never mention Sagehorn by name.  The Court does not find this argument

persuasive.  A plaintiff may show that a statement refers to him or her either explicitly or by implication.  *Glenn v. Daddy Rocks, Inc.*, 171 F. Supp. 2d 943, 948 (D. Minn. 2001). "A plaintiff does not have to be specifically named in the defamatory statement so long as a reader by fair implication would understand the statement to be directed at the plaintiff."  *Id.*  Even if Beahen never explicitly mentioned Sagehorn's name in his statements to media outlets, the complaint alleges that the statements were understood to be about Sagehorn.  Thus, it is not fatal to Sagehorn's defamation claim that Sagehorn is not named in the statements he quotes.  Because the Court finds that Sagehorn has adequately pleaded a claim for defamation, the Court will deny Beahen's motion for judgment on the pleadings as to Count V.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    The School Defendants' Motion for Judgment on the Pleadings [Docket No. 24] is **DENIED**.

2.    The Police Defendants' Motion for Judgment on the Pleadings [Docket No. 29] is **DENIED** insofar as it relates to Count V, the defamation claim against Defendant Beahen.  The Motion is **GRANTED** insofar as it relates to all other claims.

3.    Defendant Stephen Sarazin is **DISMISSED** from this case.

DATED:  August 11, 2015
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge